[Cite as *Yung v. UC Health, L.L.C.*, 2023-Ohio-789.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| WILLIAM J. YUNG, III, | : | APPEAL NO. C-220386 |
| | | TRIAL NO. A-2001838 |
| Plaintiff-Appellant, | : | |
| | : | |
| vs. | | *O P I N I O N.* |
| | : | |
| UC HEALTH, LLC, | : | |
| and | : | |
| UNIVERSITY OF CINCINNATI MEDICAL CENTER, LLC, | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: March 15, 2023

*Hemmer DeFrank Wessels PLLC* and *Scott R. Thomas,* for Plaintiff-Appellant,

*Dinsmore & Shohl LLP, Mary-Jo Pullen, Allison Knerr,* and *Marilena R. Walters,* for Defendants-Appellees.

**BERGERON, Judge.**

{¶1}    After going in for a routine MRI, plaintiff-appellant William Yung, III, walked away from the procedure alleging that his hearing was permanently damaged as a result.  Believing that the MRI technician, Kristina Waites, failed to properly secure his earplugs, he filed a medical malpractice suit against UC Health, LLC, and the University of Cincinnati Medical Center, LLC (collectively, defendant-appellees "UC Health").  After the trial court granted summary judgment, Mr. Yung appealed, raising various issues related to the expert testimony he offered to establish a prima facie case for medical malpractice.  After a thorough review of the record in this case, and taking care to construe the facts and inferences in plaintiff's favor, we agree that he raised a genuine issue of fact for trial.  Therefore, we reverse the trial court's judgment and remand the matter for further proceedings consistent with this opinion.

I.

{¶2}    The MRI in question occurred in July 2019, and Mr. Yung filed suit against UC Health in May 2020.  As the parties embarked on discovery, they took the deposition of Dr. David Greene, plaintiff's expert, in October 2021, along with a deposition of Mr. Yung around the same time.  Mr. Yung explained in his deposition that he believed that Ms. Waites improperly inserted the ear plugs in his ears right before the MRI procedure occurred.  In other words, without sufficient blockage to protect his ears, the noise of the MRI damaged his hearing.  Dr. Greene, an otolaryngologist (an "ENT"—a specialist focused on the ears, nose, and throat), offered a medical opinion that the MRI noise caused Mr. Yung's hearing loss.

2

{¶3}   After the close of discovery, in November 2021, UC Health filed a combined motion for summary judgment and a *Daubert* motion to exclude Dr. Greene's testimony.  In this motion, UC Health attacked Dr. Greene's qualifications to opine on the applicable standard of care, claiming that he neglected to offer an opinion on any breach of the standard of care.  In large measure, UC Health highlighted how (1) Dr. Greene, as an ENT, was unqualified to render an opinion for radiology or radiologic technology, and (2) Dr. Greene conceded, to some extent, that Ms. Waites' conduct was appropriate.  After the completion of briefing and oral argument on the matter, the trial court denied the motion.

{¶4}   As the case proceeded towards trial, the parties conducted a second, trial deposition of Dr. Greene.  In UC Health's eyes, Dr. Greene's testimony mirrored that of his first deposition, and he offered no new information concerning his understanding of the standard of care applicable in this case or UC Health's alleged breach of it.  In light of this, UC Health filed a renewed motion for summary judgment shortly before trial.  This motion largely repackaged UC Health's earlier arguments, essentially arguing that Dr. Greene's second deposition validated its point.   In response, Mr. Yung moved to strike the renewed motion based on the improper timing of it, while reserving the right to file a response within 28 days of service.  Regardless, four days after the filing of the renewed motion (and only three days before trial), the trial court granted it, denied Mr. Yung's motion to strike, and entered judgment before Mr. Yung could file a response to the renewed motion.

{¶5}   Mr. Yung now appeals, featuring two assignments of error concerning both the trial court's denial of his motion to strike and its grant of the renewed summary judgment motion.  Because we ultimately sustain Mr. Yung's second

3

assignment of error concerning the grant of the renewed summary judgment motion, any error concerning the denial of his motion to strike is rendered moot.

## II.

{¶6} Mr. Yung insists that the trial court erred in granting UC Health's renewed motion for summary judgment, an issue we review de novo. "Summary judgment is appropriate when the trial court, viewing the evidence in the light most favorable to the nonmoving party, determines that no genuine issue of material fact remains to be litigated, and that the evidence demonstrates that reasonable minds can only come to a conclusion that is adverse to the party opposing the motion." *Burdge v. Subvest 4, LLC*, 1st Dist. Hamilton No. C-060354, 2007-Ohio-1488, ¶ 12, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d, 317, 327, 364 N.E.2d 267 (1977); Civ.R. 56(C). This assignment of error features both a procedural and substantive component.

## A.

{¶7} Procedurally, Mr. Yung maintains that the trial court improperly denied him an opportunity to respond to the renewed summary judgment motion. After UC Health filed the renewed motion on July 18, the Ohio Rules of Civil Procedure afforded Mr. Yung until August 15 to file his response. Civ.R. 6(C)(1) ("Responses to motions for summary judgment may be served within twenty-eight days after service of the motion."). From Mr. Yung's perspective, the trial court's granting of the motion without awaiting his response constitutes reversible error, if not a due process violation.

{¶8} UC Health counters by explaining that a summary judgment denial is interlocutory in nature, which enables a trial court to reconsider the matter either sua

sponte or upon the filing of another motion. *See State ex rel. Turner v. Ohio Adult Parole Auth.*, 10th Dist. Franklin No. 91AP-223, 1991 Ohio App. LEXIS 3119, 5 (June 25, 1991); *First Place Bank v. Blythe*, 7th Dist. Columbiana No. 12CO27, 2013-Ohio-2550, ¶ 18. In its view, although the first and renewed motions were not identical, the substantive issue set forth by UC Health in the renewed motion simply recapitulated matters addressed in the first motion. Both parties agree (more or less) on this point: the contents of Dr. Greene's second deposition largely track the substance of his previous deposition, without any material difference between the two from the perspective of the propriety of summary judgment.

{¶9} Normally, because of the burden-shifting framework of summary judgment, "[a] trial court must afford a non-moving party time for a full and fair response before ruling on a motion for summary judgment. * * * A trial court's failure to do so implicates procedural due process rights of the nonmoving party and constitutes reversible error." *Green Tree Servicing LLC v. Graul*, 10th Dist. Franklin No. 15AP-761, 2016-Ohio-4641, ¶ 11. This case falls in a gray area because Mr. Yung had an opportunity to respond to the first motion, and we see no indication that he was deprived of the opportunity to develop facts or arguments related to the renewed motion based on its limited contents. Regardless, while the trial court's short-circuiting of the summary judgment response deadline does raise some concerns, we need not ultimately resolve that issue in light of our conclusion regarding the substance of the summary judgment decision, discussed below.

### B.

{¶10} Turning to the merits of the renewed summary judgment motion, Mr. Yung argues that he generated a genuine issue of material fact. In response, UC Health

insists that Dr. Greene lacks the requisite qualifications to testify in the manner that he did, and in any event, it claims that he did not offer testimony concerning the standard of care or its breach. We accordingly consider the requisite standards for expert testimony in medical malpractice cases and the evidence at hand.

{¶11} To establish a prima facie case of medical negligence, Mr. Yung must establish " 'evidence as to the recognized standard of the medical community in the particular kind of case, and a showing that the physician in question negligently departed from this standard in his treatment of plaintiff.' " *White v. Summa Health Sys.*, 9th Dist. Summit No. 24283, 2008-Ohio-6790, ¶ 11, quoting *Davis v. Virginian Ry. Co.*, 361 U.S. 354, 357, 80 S.Ct. 387, 4 L.Ed.2d 366 (1960). " 'Failure to establish the recognized standards of the medical community is fatal to the presentation of a prima facie case of malpractice by the plaintiff.' " *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 133, 346 N.E.2d 673 (1976), quoting *Finley v. United States*, 314 F.Supp. 905, 911 (N.D.Ohio 1970). "Proof of the recognized standards must necessarily be provided through expert testimony. This expert must be qualified to express an opinion concerning the specific standard of care that prevails in the medical community in which the alleged malpractice took place, according to the body of law that has developed in this area of evidence." *Id.* at 131-132.

{¶12} "The expert witness 'must demonstrate a knowledge of the standards of the school and specialty, if any, of the defendant physician which is sufficient to enable him to give an expert opinion as to the conformity of the defendant's conduct to those particular standards and not to the standards of the witness' school, and, or, specialty if it differs from that of the defendant.' " *Adams v. Durrani*, 183 N.E.3d 560, 571 (1st

Dist.2022), quoting *Alexander v. Mt. Carmel Med. Ctr.*, 56 Ohio St.2d 155, 160, 383 N.E.2d 564 (1978).

**{¶13}** This does not mean, however, that the expert's expertise must necessarily match that of the treating physician. In *Alexander*, the Supreme Court found a podiatrist qualified to testify about the alleged malpractice of an orthopedic surgeon in the application of and failure to remove a cast appropriately. *Alexander* at 157-158. Although the court understood that a podiatrist could not conduct foot surgery like an orthopedic surgeon, the alleged malpractice involved a matter where "the fields of medicine overlap * * * [so] the witness may qualify as an expert even though he does not practice the same specialty as the defendant." *Id.* at 158. "The application and removal of casts are not the exclusive domain of orthopedic surgeons. It is an area where the various fields of medicine overlap[.] * * * The record, therefore, contains probative evidence that there exists a minimum standard of care common to all specialties with regard to the application of casts." *Id.* at 160. Thus, the podiatrist could testify as to the duty of an orthopedic surgeon pertaining the alleged misapplication of a cast. *Id.* at 164; s*ee Adams* at 572, citing *Ishler v. Miller*, 56 Ohio St.2d 447, 453, 384 N.E.2d 296 (1978) (finding an expert in radiology and neuroradiology qualified to testify as to the malpractice of an orthopedic surgeon in reading of diagnostic images: "[the expert radiologist] worked closely with and trained orthopedic surgeons, used the same diagnostic technology as [defendant], and demonstrated knowledge of the standard used by surgeons in reviewing diagnostic images and arriving at a decision to perform surgery.").

**{¶14}** Neither party really quibbles with this legal standard; rather, they debate whether Dr. Greene qualifies as an expert pursuant to it. UC Health insists that

7

he cannot testify regarding Ms. Waites' duty of care in the performance of her role as an MRI technician, isolating a particular line of questioning from his deposition:

Q: And you're not here – you're not going to offer any opinions on standard of care for MRI technologists; is that correct?

\* \* \*

A: No. I'm offering a standard of care for ear protection, which is part of otolaryngology.

\* \* \*

Q: Okay. And, again, that's because you don't consider radiology or radiologic technology within your area of expertise, fair enough?

A: No. I'm an ENT doctor.

{¶15}  Mr. Yung says this is much ado about nothing, because he offered Dr. Greene not to opine on the intricacies of MRI techniques or procedures, but rather to testify about the dangerous levels of noise generated by MRI machines and UC Health's failure to protect his ears during the procedure.  He accordingly features this passage from Dr. Greene's deposition:

Q: Is adequately ensuring that the patient in the MRI examination has adequate hearing protection part of the standard of care in conducting an MRI?

A: Yes. And that is published by the professional organization of the radiologists and the radiology technologists.

\* \* \*

Q: And can you tell us what those opinions are?

A: Yes. It is my opinion that the MRI did, on that day, cause him to have problems with his hearing.

Q: If Mr. Yung had had properly-fitted earplug protection, would he have suffered hearing loss by virtue of being tested by that MRI?

\* \* \*

A: No.

\* \* \*

Q. And is it your opinion to a reasonable degree of medical certainty that this hearing loss that Mr. Yung experienced was a direct and proximate result of not having his ears properly protected during the MRI examination?

A. Yes, sir, it is.

{¶16} Based on his qualifications as an ENT and the record at hand, we agree that Dr. Greene is qualified to opine on the standard of care for ear protection in response to loud noises (whether that be from an MRI or a jack-hammer). This medical malpractice case does not involve some mishap in terms of the actual MRI—rather, it involves whether the technician properly inserted ear plugs in Mr. Yung's ears to protect him from the noise attendant to the procedure. As an expert "offering [an opinion on the] standard of care for ear protection," Dr. Greene's expertise appropriately "overlaps" with Ms. Waites' expertise pertaining to properly protecting a person's ears during an MRI, or in response to any other deafening noise. *See Alexander*, 56 Ohio St.2d at 160, 383 N.E.2d 564; *Adams*, 183 N.E.3d at 572-573.

{¶17} As a fallback position, UC Health argues that even if Dr. Greene were qualified, he failed to offer sufficient expert testimony to create a jury question on medical negligence. Construing the facts and inferences in Mr. Yung's favor, we disagree.

{¶18} We first consider Mr. Yung's deposition, where he explains what happened during the procedure:

Q: And then what happened?

* * *

A: Well, they placed me in the machine and got me situated, and

they stuck earplugs in my ear.

* * *

Q: And [Ms. Waites] actually placed them into your ears?

A: Yes, she did.

* * *

Q: I want to go back to the earplugs that were placed by [Ms.

Waites]. Did you feel like they were securely seated into your

ears?

A: No, I really didn't feel like they were totally seated in perfectly.

No I didn't feel that way.

{¶19} Dr. Greene may appropriately use this testimony as a basis for his conclusions since Mr. Yung's testimony was a part of the evidentiary record. *See Hitch v. Thomas*, 6th Dist. Lucas No. L-09-1292, 2010-Ohio-3630, ¶ 17, quoting Evid.R. 703 ("To establish a claim of medical malpractice, a plaintiff must prove by expert

testimony the applicable standard of care, a breach of that standard of care, and that the breach was a proximate cause of the injuries alleged. * * * The facts upon which an expert's opinion is based must be those 'perceived by the expert' or 'admitted in evidence at the hearing.' ").

{¶20} Dr. Greene testified that: (1) the MRI procedure required providing Mr. Yung with adequate hearing protection; (2) earplugs can provide appropriate hearing protection; (3) Ms. Waites failed to properly protect his ears; and (4) Mr. Yung suffered hearing loss as a result. Although, admittedly, Dr. Greene could have been clearer in his testimony (as some of his other testimony seems to absolve Ms. Waites of fault), he minimally established the medical malpractice elements to generate a question of fact for the jury. *See Alexander*, 56 Ohio St.2d at 158, 383 N.E.2d 564; *Adams*, 183 N.E.3d at 572-573.

{¶21} UC Health retorts with a number of reasons that Mr. Yung's claim is improbable, including that he had access to a squeezable ball during the procedure that he was instructed to squeeze if he encountered any problems or discomfort. All of these points, however, present issues for the jury to decide at trial. We must construe the evidence in Mr. Yung's favor at this juncture, and we cannot undertake any weighing of the evidence. *See Packman v. Barton*, 12th Dist. Madison No. CA2009-03-009, 2009-Ohio-5282, ¶ 8 ("[An appellate] court does not weigh the evidence when reviewing an entry granting summary judgment on appeal * * *.").

\* \* \*

{¶22} In light of the foregoing analysis, we sustain Mr. Yung's second assignment of error, hold his first assignment of error moot, reverse the trial court's judgment, and remand for further proceedings consist with the law and this opinion.

Judgment reversed and cause remanded.

**ZAYAS, P.J.**, and **BOCK, J.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.